## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| GABRIEL R. HULL, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, PAUL W. BOYD, MERRILL A. McPEAK, GERALD E. HANNAHS, JR., CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER, AEGIS CAPITAL CORP., DOMINICK & DOMINICK LLC, I-BANKERS SECURITIES, INC., LADENBURG THALMAN & CO. INC., MAXIM GROUP, LLC, MLV & CO. LLC, NATIONAL SECURITIES CORPORATION, and NORTHLAND SECURITIES, INC.,<br><br>Defendants. | Civil Action No. _____<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff, Gabriel R. Hull ("Plaintiff"), by his attorneys, and on behalf of himself and all others similarly situated (the "Class"), submits this action for damages against the defendants named herein. With the exception of allegations which pertain to Plaintiff, which are based on personal knowledge, Plaintiff alleges the following upon information and belief and upon the investigation of Plaintiff's counsel, which included, *inter alia*, a review of U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller Energy" or the "Company"), regulatory filings and reports, press releases and other public statements issued by Miller Energy, media reports about or relating to Miller Energy, and various proceedings, orders, and filings in *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this class action seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Miller Energy preferred stock pursuant and/or traceable to the registration statement and prospectuses issued in relation to the public offerings of Miller Energy's 10.75% Series C Cumulative Redeemable Preferred Stock ("Series C" or "Series C Preferred Stock"), and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D" or "Series D Preferred Stock") (collectively, the "Offerings").

2.      This class action is brought against several former directors and executive officers of Miller Energy and the underwriters which conducted the Offerings.

3.      On October 1, 2015, Miller Energy and certain of its subsidiaries filed voluntary petitions for relief under the provisions of Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Alaska (the "Bankruptcy Court"). The Company is therefore not a named defendant herein.

4.      On January 28, 2015, the Bankruptcy Court confirmed the Joint Plan of Reorganization of the Company (as amended and supplemented, the "Plan"). Under the Plan, equity interests in Miller Energy were not to be entitled to any distributions. On March 29, 2016 (the "Effective Date"), the Plan became effective and the debtors emerged from their Chapter 11 cases.

5.      On the Effective Date, all equity interests in Miller Energy were cancelled, including outstanding shares of common stock, approximately 25,750 outstanding shares of Series B Redeemable Preferred Stock with a redemption value of $100 per share, approximately 3,250,000 outstanding shares of Series C Preferred Stock with a redemption value of $25.00 per

share, and approximately 3,499,723 outstanding shares of Series D Preferred Stock with a redemption value of $25.00 per share.

6.      This case involves financial accounting and reporting fraud, as well as audit failures, related to the valuation of certain oil and gas assets acquired by Miller Energy, an oil and gas company headquartered in Knoxville, Tennessee. Miller Energy purchased these assets, which are located in Alaska, for $2.25 million in cash – along with the assumption of certain liabilities it valued at approximately $2 million – during a competitive bid in a bankruptcy proceeding in December 2009.

7.      The Company subsequently reported those assets at an overstated value of $480 million, and recognized a one-time "bargain purchase" gain of $277 million for its fiscal third quarter ended January 2010 and fiscal year ended April 2010.

8.      The Alaska acquisition was the single most important event in Miller Energy's nearly forty-year history, transforming it from a company long mired in the penny-stock arena to one traded on a national exchange. For the week preceding the acquisition, Miller Energy's common stock closed at an average price of $0.66 per share. Since the acquisition, Miller Energy has raised tens of millions of dollars in debt and equity, listed its stock on the New York Stock Exchange (the "NYSE"), had its common stock traded at nearly $9 per share, and achieved in 2013 a market capitalization of $393 million.

9.      Miller Energy's CFO at the time, defendant Paul W. Boyd ("Boyd"), failed to account for the acquisition in accordance with generally accepted accounting principles ("GAAP").

10.     Specifically, Accounting Standards Codification ("ASC") 805, Business Combinations, required Miller Energy to record the value of its acquired Alaska assets (the

"Alaska Assets") at "fair value." Contrary to authoritative accounting guidance however, Boyd used as fair value a reserve report (the "Reserve Report") that was prepared by a petroleum engineer firm using the rules for supplemental oil and gas disclosures. As set forth in GAAP, the numbers used in these supplemental disclosures do not reflect fair value, and the reserve report used by Boyd expressly disclaimed that the numbers therein represented the engineer firm's opinion of fair value. The reserve report Boyd used also contained expense numbers that were knowingly understated by defendant David M. Hall ("Hall"), the then-CEO of Miller Energy's Alaska operations. In addition, Boyd double counted $110 million of certain fixed assets that were already included in the reserve report.

11.     Miller Energy's financial statements for fiscal 2010, the first annual period in which the Company reported the fair value of the acquired assets, was audited by non-party Sherb & Co. LLP ("Sherb & Co."), a now-defunct CPA firm that was suspended by the SEC in 2013 for improper professional conduct unrelated to this matter.

12.     The Sherb & Co. lead engagement partner on the Miller Energy audit, non-party Carlton W. Vogt, III, CPA ("Vogt"), failed to comply with the Public Company Accounting Oversight Board ("PCAOB") rules and standards in auditing Miller Energy's financial statements that included its accounting for its Alaska acquisition. Vogt failed to exercise due professional care and skepticism by not adequately assessing whether the Company's accounting treatment for the acquisition complied with GAAP. Vogt also failed to obtain sufficient competent evidential matter for management's assertions regarding the fair value of the Alaska Assets.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). Many of the acts and practices complained of herein, including the preparation and distribution of the materially false and misleading information, occurred in substantial part in this District and Miller Energy maintains its principal place of business in this District.

16.     This Court has personal jurisdiction over each of the defendants named herein because they conducted substantial business in and/or were citizens of the State of Tennessee at the times relevant to this action and the violations of law alleged in this class action complaint (the "Complaint") occurred in the State of Tennessee.

17.     In connection with the acts and omissions alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

18.     Plaintiff Gabriel R. Hull purchased Miller Energy Series C and Series D Preferred Stock pursuant and/or traceable to the Offerings, and was damaged thereby.

19.     Non-party Miller Energy Resources, Inc. (f/k/a Miller Petroleum, Inc.) is a Tennessee corporation with its principal place of business in Knoxville, Tennessee. It is engaged in the exploration, development, production, and drilling of oil and gas resources in Alaska and

Tennessee. Between March 2010 and August 2014, Miller Energy issued shares of common and preferred stock for proceeds of tens of millions of dollars. At all times relevant to this action, Miller Energy's common stock was listed on the NYSE under the ticker symbol "MILL." The Series C and Series D Preferred Stock traded on the NYSE under the ticker symbols "MILLprC" and "MILLprD," respectively. On September 11, 2015, Miller Energy filed with the SEC three notifications of removal from listing and/or registration from NYSE concerning its common stock, Series C and Series D, respectively, and on March 29, 2016, all equity interests in Miller Energy were cancelled.

20.     Defendant Deloy Miller ("Miller") founded Miller Energy in 1978. He served as the Company's Chief Executive Officer from 1967 through August 2008 and thereafter served as the Company's Chief Operating Officer for a certain period of time. Miller served as the Chairman of the Board of Directors (the "Board") from December 1996 until September 14, 2014.

21.     Defendant Scott M. Boruff ("Boruff") has been Miller Energy's Chief Executive Officer from August 6, 2008, to September 14, 2014. He has been a member of the Board since August 6, 2008, and served as Executive Chairman from September 14, 2014, until his departure from the Board on March 29, 2016. Previously, Boruff was the President of Miller Energy from June 26, 2010, until June 9, 2011. Boruff is the son-in-law of defendant Miller.

22.     Defendant David J. Voyticky ("Voyticky") was a member of Miller Energy's Board from April 26, 2010, until April 2014. Defendant Voyticky served as the Company's President from June 9, 2011, until August 12, 2014, and as its acting Chief Financial Officer from September 2011 until February 2014.

23.     Defendant Catherine A. Rector, CPA, served as Miller Energy's Vice President and Chief Accounting Officer from July 30, 2012, until October 2013.

24.     Defendant Hall served as Miller Energy's Chief Operating Officer from July 18, 2013, until August 6, 2015 and as a director of the Company from December 10, 2009, until August 6, 2015. Hall had previously served as CEO of Miller Energy's Alaska subsidiary, Cook Inlet Energy, and has worked with the acquired Alaska Assets since at least the mid-1990s, when Miller Energy's predecessors began compiling the assets. Prior to joining Miller Energy, Hall served from January 2008 to December 2009 as Vice President and General Manager of Alaska Operations for the immediate past owner of the acquired assets, Pacific Energy Resources, Ltd. In this capacity, Hall was the most senior employee in Alaska responsible for the day-to-day operations of the oil and gas properties.

25.     Defendant Boyd has been a licensed CPA in Tennessee since 1993. Boyd was Miller Energy's Chief Financial Officer and its principal accounting and financial officer from September 23, 2008, through September 19, 2011, and the Company's Director of Risk Management from 2011 until 2014.

26.     Defendants Bob G. Gower ("Gower"), Gerald E. Hannahs, Jr. ("Hannahs"), Joseph T. Leary ("Leary"), William B. Richardson and Marceau N. Schlumberger served on the Company's Board at the time of one or several of the Offerings.

27.     Defendants Leary, Merrill A. McPeak ("McPeak"), and Charles M. Stivers ("Stivers") served as members, and defendants Gower and Don A. Turkleson, CPA ("Turkleson"), served as Chairs of the Board's Audit Committee at the time of one or several of the Offerings.

28.     The defendants named in ¶¶20-26 are referred to collectively herein as the "Individual Defendants." The Individual Defendants named in ¶¶20-25 are also sometimes referred to as the "Officer Defendants."

29.     The Individual Defendants named in ¶¶20-24 and defendants McPeak, Hannahs, Stivers and Turkleson each signed the registration statement filed with the SEC on Form S-3 on September 6, 2012 (the "Registration Statement").

30.     Defendants Aegis Capital Corp. ("Aegis"), Dominick & Dominick LLC ("D&D"), I-Bankers Securities, Inc. ("IBS"), Ladenburg Thalman & Co. Inc. ("LTC"), Maxim Group, LLC ("Maxim"), MLV & Co. LLC ("MLV"), National Securities Corporation ("NSC"), and Northland Securities, Inc. ("NSI") (collectively, the "Underwriter Defendants") are financial services firms which provide brokerage, investment banking, securities investment and financial advisory services, including the underwriting of public offerings of securities. The Underwriter Defendants conducted the Offerings as underwriters.

31.     Non-party Williams Financial Group, Inc. ("Williams") is a financial services firm. Williams conducted one of the Offerings as an underwriter.

32.     Underwriters engage in the planning and timing of, and marketing and pricing of offerings of securities, by preparing and distributing offering documents, conducting road-shows and arranging meetings between representatives of issuers and potential investors, in order to obtain indications of interest and buy orders from investors. Underwriters thus play a crucial role in securities offerings and "[n]o greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so. He is familiar with the process of

investigating the business condition of a company and possesses extensive resources for doing so... Prospective investors look to the underwriter – a fact well known to all concerned and especially to the underwriter – to pass on the soundness of the security and the correctness of the registration statement and the prospectus."

33.     In the course of their conducting of the Offerings, the Underwriter Defendants planned and devised a strategy to best accomplish the Offerings, had access to confidential, internal corporate information concerning the Company's operations and financial status and prospects in order to undertake their risk mitigation process of reasonable and diligent investigation in connection with an issuer and its securities or "due diligence", prepared and distributed documents and arranged meetings with investors to market the Offerings, and sold the Offerings' securities. In the course of their conducting of the Offerings, the Underwriter Defendants and the Company and its agents agreed on terms of the Offerings, the language to be used in the Registration Statement and the prospectus supplements related to the Offerings (collectively, the "Prospectuses") and disclosures to be made further to the Offerings. The Underwriter Defendants therefore knew, or should have known, of the Company's financial accounting and reporting fraud, as well as audit failures, as alleged herein. The Underwriter Defendants were paid for their services in connection with the Offerings.

34.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC, further to which they offered for sale and sold the Offerings' securities, including to Plaintiff and the Class (as defined herein). Pursuant to Sections 11 and 12(a)(2) of the Securities Act, respectively, the Underwriter Defendants are liable for the material, false and misleading statements and omissions contained in the Registration Statement and Prospectuses.

35.     Non-party Vogt, has been a licensed CPA in the state of New York since 1998. He was a partner at non-party Sherb & Co., a now-defunct accounting firm based out of New York, from January 2005 to October 2011. Sherb & Co. had served as the Company's external auditor and Vogt led an audit team that audited the Company's financial statements for fiscal 2009 and fiscal 2010.

## SUBSTANTIVE ALLEGATIONS

### Background

36.     Miller Energy was founded in 1967 as an oil and gas exploration and production company, and went public via a reverse merger in 1996. Between early 2002 and December 2009, Miller Energy's stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007. In August 2008, Miller Energy named a new CEO. Soon thereafter, the Company began acquiring additional oil and gas properties.

### Miller Energy Acquires and Overvalues the Alaska Assets

37.     In the fall of 2009, Miller Energy became aware of certain oil and gas properties in Alaska that were in the process of being "abandoned" as part of the bankruptcy proceedings of a California-based energy company.

38.     Unable to service its heavy debt and pay the significant monthly costs required to operate the properties, the bankrupt entity unsuccessfully sought for almost a year to sell its Alaska assets. Beginning in December 2008, months before it filed for bankruptcy, the former owner of the assets, with the help of one of a financial advisory and asset management firm, marketed the same group of assets that Miller Energy ultimately bought to 40 potential buyers. This process failed to attract any bidders, and the assets were auctioned by the bankruptcy court in July 2009, with the winning bidder agreeing to a total purchase price of $8 million for the

assets. A second entity, who bid $7 million, was designated as the back-up purchaser. Neither bidder closed.

39.     As a result, the former owner of the assets sought in August 2009, and was granted in September, an order from the bankruptcy court allowing it to abandon title to the assets due to a lack of interest.

40.     Due to renewed interest in the assets following their abandonment from Miller Energy, the bankruptcy court permitted the debtor to reacquire the Alaska assets and sell them to Miller Energy in a competitive auction for $2.25 million in cash and the assumption of certain limited liabilities. The transaction closed on December 10, 2009.

41.     On March 22, 2010, Miller Energy filed with the SEC its quarterly report on Form 10-Q for its fiscal third quarter ended January 31, 2010 and reported a value of $480 million for the Alaska Assets acquisition, which amount was comprised of $368 million for oil and gas properties and $110 million for fixed assets. Miller Energy also reported an after-tax $277 million "bargain purchase gain," which boosted net income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the year before.

42.     Subsequently, Miller Energy announced the value of the Alaska Assets to over $800 million, in May 2010, and over $1.2 billion, in August 2010.

43.     These inflated balance sheet and income statement numbers were repeated in numerous documents subsequently filed with the SEC.

44.     The newly-booked value of the Alaska acquisition, which resulted in a nearly 5,000% increase in Miller Energy's total assets, had a significant impact on Miller Energy's stock price.

45.     On December 10, 2009, the date of the transaction, Miller Energy's common stock closed at $0.61 per share. By March 31, 2010, the Company's common stock closed 982% higher at $6.60 per share. Weeks later, its common stock began trading on NASDAQ and, after moving to the NYSE a year later, reached an all-time high price on December 9, 2013 of $8.83 per share.

46.     At various times following the Alaska acquisition, the Company publicly defended its valuations and financial reports as correct and complete. For example, on July 28, 2011, a website called *TheStreetSweeper* published a report stating the Alaska Assets were actually worth between $25 million and $30 million and were offset by $40 million worth of liabilities. The Company disputed the accuracy of this report.

### The False and Misleading Registration Statement and Prospectuses, And the Offerings

47.     On September 6, 2012, Miller Energy filed the Registration Statement using a "shelf" registration. Under the shelf registration, Miller Energy would issue and sell securities described in subsequent Prospectuses in connection with one or more offerings and any Prospectus would form part of the Registration Statement for each offering.

48.     On September 18, 2012, the SEC gave notice of effectiveness of the Registration Statement.

49.     The Registration Statement expressly incorporated by reference certain filings Miller Energy had previously made with the SEC and future filings until any offering conducted under the shelf registration statement was completed.

50.     On March 29, 2016, the Company admitted its financial statements from prior years beginning in fiscal year 2010, as filed with the SEC, should no longer be relied upon. In its disclosure, the Company referred specifically to the financial information related to the valuation of the Alaska Assets.

51.     The Registration Statement, including the Company's financial statements incorporated therein by reference, and each of the Prospectuses, were thus negligently prepared and not prepared in accordance with the rules and regulations governing their preparation, and were false and misleading.

52.     The Series C Preferred Stock and Series D Preferred Stock Offerings occurred in six separate offerings, and Prospectuses for each such offering, which formed part of the Registration Statement, were filed with the SEC, on or about February 13 (Offering "C1"), May 8 ("C2"), June 28 ("C3"), September 26 ("D1"), October 17, 2013 ("D2"), and August 21, 2014 ("D3").

53.     All Underwriter Defendants participated in the undertaking of due diligence in relation to all six Offerings, in the preparation of the shelf registration statement, and in the marketing, pricing and selling of one or more of the six Offerings.

54.     Defendant Aegis acted as Co-Manager on five Offerings, namely C1-3, D1 and D3. Defendant D&D acted as Co-Manager on one Offering, namely D1. Defendant IBS acted as Co-Manager on one Offering, namely D3. Defendant LTC acted as Co-Manager on two Offerings, namely D1 and D3. Defendant Maxim acted as Co-Manager on three Offerings, namely C1-3, and acted as Joint Book-Running Manager on two offerings, namely D1 and D3. Defendant MLV acted as Joint or Sole Book-Running Manager on five Offerings, and, on D2, as sole underwriter. Defendant NSC acted as Co-Manager on four Offerings, namely C1-3 and D3,

and acted as Lead Manager on one Offering, namely D1. Defendant NSI acted as Co-Manager on three Offerings, namely C3, D1, and D3. Non-party Williams acted as Co-Manager on one Offering, namely C1.

55.     The Offerings were conducted successfully. The sale of a total of 1.46 million shares of Series C Preferred Stock raised gross proceeds of approximately $35 million, cumulatively. The sale of a total of 4.75 million shares of Series D Preferred Stock raised gross proceeds of well over $100 million, cumulatively.

**Under GAAP, Miller Energy Was Required
to Record the Alaska Acquisition at Fair Value**

56.     ASC 805, Business Combinations – formerly Statement of Financial Accounting Standards ("SFAS") 141(R) – became effective in December 2008. Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," e.g., entities purchased at fire sales prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement.

57.     ASC 820, Fair Value Measurements (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." A reporting entity must determine an appropriate fair value using one or more of the valuation techniques described in accounting literature.

58.     ASC 820 outlines three broad approaches to measure fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to convert future amounts to a single discounted present value amount. Finally, the cost approach is

based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost.

59.     ASC 820 emphasizes that fair value is a market-based measurement, not an entity-specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability.

60.     ASC 820 emphasizes that when a price for an identical asset or liability is not observable entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions market participants would use.

61.     When computing their estimate of fair value, Miller Energy and Boyd failed to consider the existence of numerous, readily apparent data points strongly indicating that the assets were worth substantially less than the $480 million value Miller Energy recorded. In failing to do so, Miller Energy and Boyd, materially overstated the value of the newly acquired Alaska Assets.

62.     As alleged herein, Miller Energy purported to value its Alaska acquisition using the income approach for the oil and gas reserves and the cost approach for certain fixed assets.

**The Valuation of the Acquired Oil and Gas Properties
Was Based Upon a Reserve Report, Which Does Not Represent Fair Value**

63.     To record the value of the acquired oil and gas properties, Miller Energy and Boyd requested and improperly used a reserve report prepared by an independent petroleum engineer firm.

64.     Reserve reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties.

65.     Shortly after the acquisition, Boyd asked Hall – a non-accountant with no formal accounting training – to obtain a reserve report for the Alaska properties in order to determine the fair value of the acquired assets to be reported on Miller Energy's Form 10-Q for the quarter ended January 31, 2010.

66.     On January 5, 2010, Hall hired a petroleum engineer firm to prepare a reserve report using a pretax present value of net cash flows discounted at 10% ("PV-10"), which, while appropriate with further adjustments for SEC supplemental disclosures, was not indicative of fair value.

67.     The petroleum engineer firm did not know Miller Energy intended to use the report for fair value purposes and believed that the purpose of the report was for use as supplemental data in the company's SEC disclosures. Indeed, the two page engagement letter with the engineer firm includes no language about "fair value," "fair market value" or authoritative accounting literature.

68.     The Reserve Report was finalized in February 2010 and reflected PV-10 of $368 million.

69.     Upon receiving the Reserve Report, Boyd, without undertaking any additional analysis, merely recorded as the fair value of the acquired oil and gas properties the sum of the PV-10 estimates for 100% of the proved, probable, and possible reserves, which increased the book value of Miller Energy's oil and gas properties on its balance sheet by $368 million.

70.     The Reserve Report itself clearly stated that the numbers therein were not an estimate of fair market value. Specifically, on page 3 of the report, it states that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value." Boyd never reviewed or questioned any of the Reserve Report's assumptions or calculations, nor did he communicate with the engineer firm about the Reserve Report.

71.     The use of the PV-10 numbers as fair value conflicted with contemporaneous representations Miller Energy made to investors. Specifically, in its fiscal 2010 Form 10-K, which was the first annual report that included the inflated values, Miller Energy expressly told investors that "[o]ur PV-10 measure and the standardized measure of discounted future net cash flows do not purport to present the fair value of our natural gas and oil reserves." Despite that disclosure, Miller Energy had actually used its PV-10 measure in that very same report as the fair value of its acquired properties.

72.     The $368 million reserve report value did not represent fair value for several reasons.

73.     Despite showing years of net profit that market participants would expect to be taxable, the Reserve Report did not make any adjustments for income taxes.

74.     At Miller Energy's request, the Reserve Report used a 10% discount rate that was inappropriate under GAAP for determining fair value. In a discounted cash flow model, a discount rate is used to account for the uncertainties associated with risk and the time value of money. A discount rate is the required rate of return that an investor would demand – based on the risks associated with the benefit stream under consideration – to induce the investor to make an investment. By failing to consider the discount rate using assumptions market participants would use, Miller Energy materially overstated the value of the acquired oil and gas properties.

75.     The valuation also overstated cash flows from certain categories of reserve estimates (*e.g.*, "probable" and "possible" reserves) by failing to apply any risk weight to such reserves and the resulting cash flows. Given the high degree of uncertainty associated with cash flows from these reserve estimate categories, they are required to be risk weighted in order to reflect an appropriate valuation.

76.     Pursuant to Final Reporting Release No. 78, *Modernization of Oil and Gas Reporting*, as amended, reporting companies may classify undeveloped reserves as "proved" only if the development plan for those reserves provides for drilling within five years of being booked, unless justified by "specific" circumstances. In violation of this oil and gas reporting disclosures rule, Miller Energy improperly included estimated values of reserves that it was not to develop within the requisite five-year period.

77.     The Reserve Report did not include amounts for certain asset retirement obligations, *i.e.*, the legal obligations associated with the retirement of tangible long-lived assets.

78.     Finally, the $237 million of projected operating and capital expenses in the Reserve Report, which were provided by Miller Energy and Hall, were intentionally understated, resulting in an overstated valuation.

79.     In fact, one petroleum engineer firm contacted but not used by Miller Energy thought that the expected level of expenses made a significant portion of the acquisition unprofitable. Initially, Hall contacted the petroleum engineer firm who had previously provided the past two owners of the properties with reserve reports, and thus had unfettered access to past operating data, and requested a quote for "updating" a prior reserve report. That firm told Hall that it would not assign any value to one of the largest fields acquired, the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash

flows – and explained that it would not put its "name on a report that implies value exists where it likely does not."

80.     Boyd was aware that Miller Energy chose the new firm because the prior firm would not assign any value to the Redoubt Shoal field. The Redoubt Shoal field – which represented $291 million of the $368 million in fair value recorded by Miller Energy – showed positive future cash flows in the reserve report primarily because Hall gave the new engineer firm understated and unsubstantiated expense numbers. Boyd had previously been advised by Vogt that the lack of any controls over Hall's expense estimates was a "concerning void."

81.     Miller Energy and Hall provided expense projections that, in many cases, were significantly lower than past actual experience. For example, internal documents maintained by Hall indicate that the cost to drill a new well in the Redoubt field was roughly $13 million. However, Hall told the engineer firm to use a cost of $4.6 million per well in its reserve report. And instead of using recent expense data Hall gave the engineer firm nearly three year old operating expense data, which he revised down on the pretext that Miller Energy could run a leaner operation than former operators of the properties. By way of example, Hall told the engineer firm that the offshore Redoubt field would cost $399,000 per month to operate when it actually cost the seller more than $600,000 per month and when internal estimates show that Miller Energy and Hall expected the field to cost more than $800,000 per month once fully operational. Additionally, in some years, the report included zero expenses for operating the facilities in Redoubt and another field.

82. Overall, the Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves. That level of operating expenses was unreasonable in light its predecessor's actual operating expenses of $32.50/boe in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in.

83. By understating the expense numbers, the Miller Respondents overvalued the oil and gas properties by tens of millions of dollars.

**The Fair Value of the Acquired Fixed Assets Was Double-Counted and Overstated**

84. In addition to the $368 million value recorded for the oil and gas properties, Miller Energy also erroneously recorded a separate value of $110 million for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves.

85. In a February 8, 2010 email, Boyd informed Hall that he needed an amount to use as fair value for the fixed assets obtained as part of the Alaska acquisition. He noted that, ideally, the value should be what a willing buyer would pay for the assets, but "[i]n the absence of that, replacement values or something similar would probably work." Two days later, Boyd was sent an "asset replacement cost study" purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the assets as $110 million. The "study" was dated September 5, 2008, but "revised" on February 9, 2010.

86. Without any additional analysis, Boyd recorded the amount in the revised insurance study on Miller Energy's balance sheet.

87. The recording of assets at a value of $110 million was improper for several reasons.

88. Miller Energy's use of the values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of such assets. The Reserve Report

Miller Energy relied on to value the acquired oil and gas properties used a discounted cash flow model. Valuation specialists use such models to estimate the value of an enterprise's "operating assets" – *i.e.*, the assets employed to generate future cash flows – by converting future benefit streams into a net present value. In Miller Energy's case, the fixed assets in the insurance study were the very same operating assets that were expected to generate the future cash flows in the reserve report. Accordingly, they should not have been separately valued.

89.     Prior to the acquisition, all of the production from the offshore Redoubt Shoal field ran through the Osprey platform, which had no processing facilities or power generating capability of its own. Power was sent from generators housed within the Kustatan Production Facility to the platform via a subsea line, which was connected to an underground power grid that ran throughout all of the acquired properties. Moreover, production from the offshore platform was sent onshore for processing through pipes to the Kustatan Production Facility. Absent the platform, there would have been no way to obtain oil and gas from Redoubt Shoal without incurring upfront capital expenditures to replace the platform and its related infrastructure. Similarly, without the other production facilities, the platform would have lacked power and somewhere to process its oil and gas.

90.     The Reserve Report Miller Energy used for the valuation recognized the interconnectedness of the properties, as it expressly listed the facilities and the offshore platform as assets used to generate the future cash flows.

91.     Because the fixed assets were integral to the operations of the acquired properties, their values were captured in the reserve report's cash flows. Consequently, by separately valuing the same operating assets, Miller Energy overstated the value of the Alaska Assets by as much as $110 million.

92.     The insurance study also did not reflect fair value because the version of the insurance study used by Boyd purported to show "asset replacement cost." Absent further adjustments, replacement cost new does not qualify as fair value under GAAP.

93.     Miller Energy, at the direction of Boyd and Hall, also refashioned a preexisting insurance study to make it appear that its own value of $110 million derived from a third party. The numbers in the fixed asset study were given to the insurance broker, and its predecessor, by its clients (*i.e.*, Miller Energy and the previous owners of the fixed assets) as far back as 2007 and were used as starting points for other types of estimates, such as estimates for possible losses resulting from fire or natural disasters. The two employees at the insurance broker who were most familiar with the original "Loss Estimates Study," including the engineer who authored it, confirmed that no one at the broker ever tested or in any way double-checked the values given to them.

94.     Boyd and Hall knew or knowingly disregarded the fact that the insurance study did not reflect fair value or any analysis by the insurance broker.

95.     On February 8, 2010, Hall directed Alaska personnel to contact the insurance broker and another oil and gas consulting company to ask them for a report reflecting fair value or replacement cost. The insurance broker responded on February 9, and told Miller Energy in an email copied to Hall that it could not provide a report showing replacement costs.

96.     Miller Energy also contacted a separate consulting firm and sent it the insurance broker's original 2008 insurance report. Late on February 8, the consulting firm informed Miller Energy that the insurance study it sent was a "good reference" but the report did not state "value or replacement cost." The firm offered to conduct its own analysis, but advised that the estimate would take "approximately 2-3 weeks to complete" and "cost around $15,000-$18,000."

97.     Upon hearing the news that a new report might take two to three weeks, Alaska personnel, including Hall, called Boyd. According to one participant on this call, Boyd said he could not wait weeks for a new report. He "needed it quickly and he needed to base it on something . . . a professional had to sign off on it, not us, some third party. . . ." During the call, Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite Hall having been told by the broker that it could not provide Miller Energy with replacement costs.

98.     With the aim of making the report appear as though it reflected replacement costs, Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from "Loss Estimates Study" to "Asset replacement cost study." The revised report, which Miller Energy gave to Sherb & Co., omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the revised report were the ones provided to the broker by Miller Energy and its predecessors.

99.     On December 10, 2014, in a quarterly report filed with the SEC on Form 10-Q, Miller Energy disclosed that it was taking impairment charges of $112.4 million and $152.9 million to proved and unproved properties of the Alaska Assets, specifically the Redoubt Shoal field, respectively. On March 12, 2015, in its subsequent quarterly report, the Company disclosed that it was taking further impairment charges to proved and unproved properties of the Alaska Assets in the amounts of $81.5 million and $67.6 million, respectively.

100.    On April 29, 2015, Miller Energy disclosed it had received a "Wells Notice"[1] from the SEC, indicating that the staff of the SEC had made a preliminary determination to recommend that the SEC pursue a civil action against the Company in relation to its 2009 Alaska asset acquisition. In response, the Company publicly asserted that it did not believe that an enforcement action was warranted in this case, thereby causing concealment of the defendants' violations of federal securities laws, as alleged herein, to continue. On April 29, 2015, Boruff, Gower, Hannahs, Richardson, and Stivers were directors of the Company.

101.    On May 6, 2015, the Company announced that its Board had voted to defer the cash payment of the quarterly dividend on its Series C Preferred Stock and Series D Preferred Stock and that the amount of deferred cash payments of quarterly dividends would accrue, such that any future cash payments made to the holders of Series C and Series D would first go to retire the amount of the accrued but unpaid quarterly dividends. At the time of the filing of this Complaint, Plaintiff and the Class had received no deferred and accrued quarterly dividends since May 6, 2015.

### The SEC Enforcement Action

102.    On August 6, 2015, the SEC initiated civil administrative proceedings against Miller Energy, Boyd and Hall, and non-party Vogt (the "SEC Enforcement Action"), by way of an Order Instituting Public Administrative and Cease-and-Desist Proceedings filed that day. The SEC's Division of Enforcement alleged, among other items, that Boyd had failed to account for the Alaska Assets in accordance with GAAP, that Hall had knowingly understated expense

---

1       A Wells Notice warns its recipient of possible enforcement action by the SEC and is itself neither a formal allegation of wrongdoing nor a finding that the recipient violated any law. The recipient so warned has the opportunity to present facts and legal arguments to convince the SEC that no action should be brought.

numbers that Boyd had used, and that the Company had overstated the valuation of the Alaska Assets, resulting in false financial statements having been filed with the SEC. Vogt, the SEC alleged, failed to perform the 2010 Miller Energy audit in accordance with PCAOB Auditing Standards, by, among other items, failing to properly audit the fair value measurements and obtain sufficient competent audit evidence.

103.    On that day, despite the repeated denials by the Company over the years since 2009 that its valuations were inaccurate and, as recently as just a few months before this date, that no regulatory action against the Company related to its 2009 Alaska asset acquisition was warranted, it was thus finally revealed that the Registration Statement was in fact false and misleading in that it overstated the value of the Alaska Assets on Miller Energy's books.

104.    In a statement issued that day, William P. Hicks, Associate Regional Director of the SEC's Atlanta office, stated in pertinent part as follows:

> "Financial statement information is the cornerstone of investment decisions. We've charged that Miller Energy falsified financial statement information and grossly overstated the value of its Alaska assets and that the company's independent auditor failed to conduct an audit that complied with professional standards . . . . The SEC will aggressively prosecute such conduct."

105. As a result of the fraudulent valuations, Miller Energy filed with the SEC financial reports that materially misstated the value of its assets and/or its net income, for periods between 2010 through 2015[2], including the SEC filings incorporated by reference in the Registration Statement. Miller Energy had overvalued the Alaska Assets by more than $400 million.

106. Pursuant to Regulation S-K, Item 303 (17 C.F.R. § 229.303), *Management's discussion and analysis of financial condition and results of operations*, a registrant must provide a discussion and analysis of the financial statements and other statistical data that the registrant believes will enhance a reader's understanding of its financial condition, changes in financial condition and results of operations. The purpose of the discussion and analysis being the provision to investors of information relevant to an assessment of the financial condition and results of operations of the registrant, with a focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. At the time of each of the Offerings however, the Alaska Assets were fraudulently valued and those Company's financial reports which were incorporated into the Registration Statement by reference materially misstated the value of the Company's assets and/or its net income. The Individual Defendants have therefore failed to fulfil the continuous requirements under Regulation S-K and the Underwriter Defendants have failed to remedy this failure, and all defendants are liable to

---

2 Forms 10-Q for the third quarter of fiscal year 2010 and all three quarters of fiscal years 2011 through 2015; Forms 10-K for fiscal years ended 2010 through 2014; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424; Forms 10-Q for the third quarter of fiscal year 2010, all three quarters of fiscal 2011, and the first two quarter of 2012; Forms 10-K for fiscal years ended 2010 through 2012; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectus supplements filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424; and, no fewer than 15 Forms 8-K filed between March 2010 through at least December 2014 contained materially false and misleading.

Plaintiff and the Class for the false statements and omissions in the Registration Statement.

107. In the SEC Enforcement Action, the SEC alleged that:

a. Miller Energy violated §l7(a) of the Securities Act, §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

b. Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder;

c. Defendant Boyd willfully violated, and defendant Hall violated, §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

d. Miller Energy violated §13(a) of the Exchange Act and Rules 13a-l, 13a- 11 and 13a-13 thereunder, which require that every issuer of a security registered pursuant to §12 of the Exchange Act file with the SEC, among other things, annual, current, and quarterly reports as the SEC may require;

e. Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of §13(a) of the Exchange Act and Rules 13a-l, 13a-11 and 13a-13 thereunder;

f. Miller Energy violated § 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

g. Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of § 13(b)(2)(A) of the Exchange Act;

h. Miller Energy violated § 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

i. Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of § 13(b)(2)(B) of the Exchange Act;

j. Defendant Boyd willfully violated, and defendant Hall violated, §13(b)(5) of the Exchange Act, which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in § 13(b)(2) of the Exchange Act;

k. Miller Energy violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the SEC, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading;

l. Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of Rule 12b-20 under the Exchange Act;

m. Defendant Boyd willfully violated Rule 13a-14 of the Exchange Act, which requires that an issuer's principal executive and principal financial officers certify each periodic report; and

n. Non-party Vogt engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the SEC's Rules of Practice.

108. On August 20, 2015, Miller Energy disclosed that, on August 14, 2015, within eight days of the SEC having initiated the SEC Enforcement Action, the Company had reached an agreement in principle with the Enforcement Division of the SEC to settle the proceeding, subject to approval by the SEC. Under the terms of the proposed settlement, the Company had agreed to pay a $5 million penalty and to review and, where appropriate, restate its financial statements containing financial information related to the valuation of the 2009 Alaska asset acquisition and financial results derived from that information.

109. On October 1, 2015, Miller Energy filed for protection under Chapter 11 of the federal bankruptcy statutes.

110. On March 29, 2016, the Company disclosed it had consented on January 12, 2016, to an order (the "Order") issued by the SEC with respect to the SEC Enforcement Action. The Order included a cease-and-desist order and civil monetary penalties of $5 million to be paid consistent with general unsecured claims under the Plan.

111. On March 29, 2016, the Company disclosed it had conducted an asset impairment analysis on certain of its assets, and that, in view of the Company's bankruptcy, after further

review of financial information related to the valuation of the oil and gas properties acquired by the Company in Alaska in late 2009 and other accounting matters, the Company had concluded that its financial statements from prior years beginning in fiscal year 2010 should indeed no longer be relied upon, thereby admitting that those financial statements, and thus the Registration Statement and Prospectuses, were false and misleading when filed with the SEC.

112. On March 29, 2016, all equity interests in Miller Energy were cancelled.

113. As of the date of this Complaint, the Company, which has continued to operate its business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court, has in fact not filed with the SEC any restated financial results since August 6, 2015.

## CLASS ACTION ALLEGATIONS

114. Plaintiff brings this action both on behalf of himself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following class (the "Class"): All those who purchased Miller Energy shares of Series C and Series D Preferred Stock traceable to the Registration Statement filed in relation to the Offerings.

115. Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, defendants' parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

116. Plaintiff does not know the exact number of Class members because such information is in the exclusive control of defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely hundreds of Class members,

geographically dispersed throughout the United States such that joinder of all Class members is impracticable. Record owners and other members of the Class may be identified from records maintained by Miller Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

117.  Plaintiff's claims are typical of the claims of the Class in that all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

118.  Numerous questions of law or fact arise from defendants' conduct that is common to the Class, including but not limited to:

a.  whether defendants violated the Securities Act;

b.  whether the Registration Statement  and Prospectuses were negligently prepared, contained inaccurate statements of material fact, and omitted material information required to be stated therein; and

c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

119.  Plaintiff has retained capable counsel and Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflict with any other members of the Class.

120.  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

121. This class ac115tion is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

122. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

## FIRST CAUSE OF ACTION

### Violation of §11 of the Securities Act

### Against All Defendants, Except Defendant Boyd

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except defendant Boyd.

125. The Registration Statement was inaccurate and misleading, contained false statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

126. Defendants named in the Cause of Action are strictly liable to Plaintiff and the Class for the misstatements and omissions.

127. None of the defendants named herein undertook proper due diligence, making a reasonable and diligent investigation, or otherwise possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectuses were true and without omissions of any material facts and were not misleading.

128. By reason of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

129. Plaintiff acquired Miller Energy shares of preferred stock pursuant and/or traceable to the Registration Statement and Prospectuses.

130. Plaintiff and the Class have sustained damages.

131. At the time of their purchases of Miller Energy shares of preferred stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the SEC Enforcement Action. Less than11 one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this action is based to the time that Plaintiff commenced this action.

132. Less than three years have elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### Violation of §12(a)(2) of the Securities Act

### Against the Officer and Underwriter Defendants

133. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134. By and through their use of the flawed Prospectuses, as alleged above, the Officer Defendants and Underwriter Defendants marketed the Offerings and sold the Offering's securities to Plaintiff and other members of the Class.

135. The Officer Defendants and Underwriter Defendants owed Plaintiff and all

members of the Class the duty to undertake due diligence concerning the corporate, financial and other information contained in the Prospectuses to ensure that such information were true, complete and not misleading. The Officer and Underwriter Defendants, had they exercised reasonable care in their due diligence, knew or should have known of the materially false and misleading information and omissions contained in the Prospectuses.

136. Plaintiff did not know, nor in the exercise of his own investment due diligence could Plaintiff have known, of the materially false and misleading information and omissions contained in the Prospectuses at the time Plaintiff purchased Miller Energy securities.

137. The Officer Defendants and Underwriter Defendants therefore failed in their duty owed to Plaintiff and the Class and thereby violated §12(a)(2) of the Securities Act. As a direct and proximate result of their violations, Plaintiff and the Class who purchased the Offerings' securities pursuant to and/or traceable to the Prospectuses incurred substantial damages in connection with their purchases of the Offerings' securities. All equity interests in Miller Energy were cancelled on March 29, 2016, and therefore Plaintiff and no member of the Class presently holds any Miller Energy securities. Plaintiff and the Class seek damages to the extent permitted by law.

138. Less than three years have elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

### THIRD CAUSE OF ACTION

### Violation of §15 of the Securities Act

### Against the Individual Defendants

139. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140. This Cause of Action is brought pursuant to §15 of the Securities Act against the Individual Defendants.

141. The Individual Defendants each were control persons of Miller Energy, by virtue of their positions as directors and/or officers of Miller Energy, and Miller Energy controlled the Individual Defendants. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller Energy. The Company controlled all of its employees.

142. The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of, or having otherwise participated in the causing to come into existence of the Registration Statement.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated:  May 12, 2016

Respectfully submitted,

**HOLIFIELD, JANICH & ASSOCIATES, PLLC**

*/s/     Al Holifield*
James Al Holifield (#015494)
Christina J. Haley (#017592)
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
Telephone: (865) 566-0115
Facsimile: (865) 566-0119

**KRANENBURG**

*/s/     Werner R. Kranenburg*
Werner R. Kranenburg *(pro hac vice pending)*
80-83 Long Lane
London EC1A 9ET
United Kingdom

*Attorneys for Plaintiff*